Okay. Now I think we're set to begin. Morning. May it please the court, counsel? Yes, sir. I'd like to preface my remarks by asking you to, if you ask me questions, which I assume you will, that you move closer to your microphones. I'm hearing pretty well with the court system, but I notice that where the distance is less, it's harder to hear. Okay. More, I mean. Thank you. This is a question relating to the standards that a trial court should apply to a summary judgment motion. The court below did not really do that. The opinion, it leaves out, for example, we introduced a lot of facts in an affidavit which were not mentioned in the opinion. The court also relied on an affidavit from a McKesson compliance officer regarding the second broadcast, and we deposed that gentleman in this case, and that deposition at McKesson's insistence was sealed, but it's part of the record in the case. And the court, the things the court relied on from that deposition were contradicted in the deposition, so in the affidavit, contradicted in deposition. This is an example of juxtaposition by comparisons with a convicted felon, distortions of plaintiff's relationship with McKesson. Okay, now you say comparison with a convicted felon? Mr. Woolley. Exactly, but prior to that, in the broadcast, the broadcast indicated that Mr. Balangi was being sued for negligence. That's true. How are they being compared? That's true. Mr. Balangi was being sued for negligence. You talked about first how Mr. Woolley had been, lost his license and served six months in prison, and then talked about how the Tug Valley Pharmacy was being sued for negligently filing prescriptions. Are you saying there's an implication there, or what is the? I think that's what the CBS argues, and I don't think it's that clear. When you look at the video of the broadcast and you see everything leading up, and there's a picture of Mr. Balangi, and the key point here, I think, is the lead-in phrase, the problem persists. The problem persists. And then they misstate the deposition of Mr. Balangi in that negligence case. And I think that was the most damning part of it from his perspective. The civil case was filed 2010, 2011. There are about four or five cases, but one lawyer has sued a number of pharmacists and doctors for causing the addictions or allegedly causing the addictions of about 20 patients. And those cases are still pending, by the way. There's no resolution of those. The appeal, that is the other thing that the producer for CBS had access to, the briefs. Mr. Cagle wrote a response brief in there, and he quoted the deposition accurately. Ms. Belli, the producer, quoted it accurately in the scripts leading up to the final script. We think that Mr. Pelley, who was the on-camera speaker, added the word pain to that on the evening of the broadcast. Critical to this case is the recognition that hydrocodone in 2007, 2008, 2009, 2010, all the way up to 2014, was a Schedule III drug. Hydrocodone, if you look at the definitions of Schedule III and Schedule II, hydrocodone was not considered to be that addictive or physically addictive, maybe psychologically addictive, whereas OxyContin and other drugs were Schedule II drugs. They clearly are addictive drugs. And also, I'd like to call your attention to the fact that these two pain clinics that were shut down by the DEA in 2010, I think 2010 and 2009, both pain clinics were shut down, and criminal prosecutions resulted... Mr. McQueen, I want to ask you a question. Which of these claims are you addressing? Are you addressing your defamation claim, the implication of defamation, or the false light claims? Both. I mean, I've alleged both. I understand, but there are different elements of each. So I'm trying to understand the evidence that you are presenting here as to what supports it. But in every instance, the central question is, were the statements false? Yes, they were false. And which of those statements do you maintain were false? Both. Tell me this statement. Huh? Tell me this statement that you say is false. I think it's false that Mr. Balengie was filling 150 pain medications per day or daily from one clinic alone. Was that not testimony that on seven occasions that did happen? Was that not testimony that on seven occasions that did happen? Yes, that's true. That did happen. And on seven out of 562 days, my question is, or my reaction to that is. Counsel, sorry. Seven divided by. Over here, sorry. I'll speak up. And I understand there was also evidence that the average, I think over a number of years, was 162 pain medications filled per day. Now, not from one single clinic, but total was 162 average daily. That was the evidence. I don't think that's correct. That math, Mr. Sullivan. I think over 2008, 2009, 2010. They're confusing controlled substances with pain medications. I mean, all controlled substances are not pain medications. And they're arguing. Once they got into this and started figuring out, as we did, how many, what numbers were, they started shifting their argument from pain medication to controlled substances. That's Schedule 2, 3, 4, all kinds of other things, muscle relaxants and so forth. So that is not, that calculation would not be accurate. My calculation of that was that from one pain clinic alone, the average was 78. And I put that, it's in the affidavit I submitted. So the, you know, this is not substantial truth by any stretch. The more serious thing is the problem persists. And Mr. Balangi, during the year before this broadcast, he averaged 25 prescriptions per day. Every year from 2009, six years earlier, after the pill mills closed, his level of hydrocodone, he hardly ever filled OxyContin prescriptions, but hydrocodone went down significantly. Twenty-five per day in 2015. CBS needed currency. They were trying to make this look like an exposé that wasn't really true. The exposé they were presenting happened six years earlier, and they made Mr. Balangi look like he was currently a danger, a threat to the community. Mr. McQueen, did you make that temporal implication argument to the district court? I believe I did. They say I didn't, but I think I did. Okay. Well, we'll keep checking the record, but I was not able to find it. I won't argue with that. Perhaps your co-counsel could slip you a note or something during your presentation or during your rebuttal. We focused primarily on the word pain up until that point, and I'm not surprised that maybe we didn't mention it that way, but that is a critical point, and we did present facts in our response to the summary judgment, affidavits and so forth, that dealt with those numbers, numbers of drugs and so forth, and we presented those facts not only to show what was currently going on, but also to show what the history had been over seven years. These are jury questions. Judge Goodwin essentially made credibility determinations. He followed, he weighed evidence. Obviously, he had a strong aversion to anything relating to drugs, and I think that that's wrong. He should not have done that. His order that we appealed from is unbelievable as far as the standards for summary judgments are concerned. Mr. McQueen, Mr. McQueen, can you hear me? I don't want you to get away from this question that maybe did you weigh this, because I don't want you to be surprised if something different happens. I want to give you a chance to address it. What Judge Keenan was asking you was, at least insofar as the implication of defamation, before the court below, you argued three distinct theories, and the court addressed each one of them. Up here, you are addressing something totally different, which is contemporary reality of the offenses. You say you're not sure you brought it up below, but maybe if you can't find it now when you come back on rebuttal, it would be helpful to show that to us where you argued it, because it is critical. And I don't want you to argue, and that's to allow you to go forth. And I understand, even with the hearing thing, I want it to be fair to you, to give you a chance to respond to that, because that appears to be a clear waiver. You cannot argue something totally different, a new theory, before this court when you didn't argue it to the court below. You understand what I'm saying? But you don't have to go there now. If you can find it, any indication that would give us at least a fair indication that you argued it, then maybe that might be enough, but we can't find it. Right now, you have three theories, and none of those deal with the theory you bring here today, at least from the perspective of the court. So correct us if you can when you come back. Okay. I mean, it's clear that the word pain was not the producer had no reason or right to put the word pain in this broadcast, and that did change the meaning. And I think when you look at the standards of care that were in existence early on and the fact that hydrocodone changed from Schedule III to Schedule II four or five years later, I think there's a question of fact all across this. And certainly, I don't see how you can say seven out of 562 is substantial truth. There's not much of a difference between substantial truth and a scintilla of evidence, if you buy that connotation. Then the McKesson, the second broadcast, Mr. Balaji had not been doing business with McKesson for, only did business with him for five months before the broadcast. And the second broadcast makes him look like he's taking incentive payments that is totally distorted the way they represent him there. And he wasn't incentivized. The judge had an obligation to look at the evidence in a light most favorable to the plaintiff. He weighed credibility, weighed evidence, draw reasonable inferences. The lower court violated all those standards for summary judgment. And West Virginia law, what applies here, they're going to argue when they get up. I'm through. I'm sorry. My time is up. Thank you. All right, sir. Thank you. We'll hear from you later on in rebuttal. Mr. Sullivan. Good morning. May it please the court. I'm going to go right to kind of see if we can't clear up some of the facts here. When you look back when this whole thing started, Mr. Ballengy opens Tub Valley Pharmacy in Williamson, West Virginia in 2007. When he opened that pharmacy, he knew that there were two pain clinics within a block of his new business. Why don't you answer the question. Were the statements false? No, sir. No, sir. And that's my hope. This has been in this case from the beginning. And it will be through all you hear from me today. If you were to go there and address that, I think you would hit a big part of this case to tell us why it is you say these statements were not false. All right. The opponent has indicated seven times out of 500 days can't be substantial. So you need to address that concern and go right to it. Because it goes to the defamation claim in the first instance. And then insofar as the implication, it has implications there as well as in the false light as to whether these statements were false. But make sure you tell us what statements you are referring to. I will. Let me just give you some key facts. And let's talk about that seven days. Seven days during this period, 2008 and 2009, Tug Valley filled more than 150 prescriptions for hydrocodone written by Mountain Medical. That's the one clinic. All right. In 2009, West Virginia Board of Pharmacy Records, undisputed, can't quarrel with that, showed that Tug Valley dispensed 42,115 hydrocodone prescriptions. This goes to the point raised by Judge Rushing. If you do the math, what that works out to is an average of 162 hydrocodone prescriptions dispensed every single working day. All right. And we're in here quarreling about 150. All right. At least one patient of Dr. Schaefer, one of those pill mill doctors who gets her prescriptions at Tug Valley, she dies from a combination of these prescriptions, hydrocodone and a benzodiazepine. Now, what happens here is the plaintiff says, well, geez, in my math, seven out of two years' worth of days isn't substantial truth. And what you see is that throughout this case, the plaintiff has failed to comprehend the principles that undergird the substantial truth doctrine. And what we're talking about there is you ask what the false statements are. What are we fighting about here? The CBS reports, according to the plaintiff, contain only two false, allegedly defamatory statements. The first they quarrel with. The reports state that Ballengy and Tug Valley are defendants in civil suits that allege negligence or substandard care, that he was providing substandard care. Second, this business where the January 7 report stated that records show Tug Valley was filling 150 pain prescriptions a day from one clinic alone. The second of the challenge broadcasts, the May 25 report, stated that Ballengy admitted to filling 150 pain prescriptions daily for one clinic alone. Those statements, Your Honor, are true. Okay, Mr. Sullivan, what about the statement that West Virginia is suing, accusing pharmacists and drug distributors of making millions? And the state actually brought the lawsuits against the distributors and not the pharmacy. Is there an implication there? Well, the court, Your Honor. That is a false statement? Yeah. Judge Goodwin said, okay, let's look at that. Is there an implication there that the state was suing Tug Valley Pharmacy and Mr. Ballengy? And the court found that in that instance, the piece could be susceptible of that implication. So he looked at it. And what he saw is what we presented in the record were the complaint that the state did file against those drug distributors. And in that complaint, the state went on at some length about these various pharmacists that were part of this whole thing. And said things like Tug Valley was one of the most notorious of the pill mill pharmacies in southern West Virginia. Right, but the state was not suing the pharmacies. No, it was not. But yet the CBS broadcast said that the state is suing, accusing pharmacists and drug distributors. So. It did. That isn't accurate. It's not. It's not. But there's no defamatory meaning. He can't prevail on that because the defamatory meaning from that is the state thinks that he's an improper pharmacy, that he's conducting improper practices. And the fact of the matter is the state is demonstrated by the complaint it did file does indeed think that. Okay. And said that in some detail in that complaint. So you can't. He doesn't get home on that. You have to have falsity and you have to have defamatory meaning. Right. And the substantial truth of it is, is the state did think ill of Mr. Balanji and his practices. Right. But the statement here is that the state is suing. And it seems to me that's the weak part of your case. If you have a weak part, that where you have the statement being made that the state is suing, comma, accusing pharmacies and distributors. So fairly glean from that, the state is suing the pharmacies. And then to go on, the Tug Valley is being sued for negligently filing prescriptions. Well, West Virginia never sued Tug Valley. They did not. Right. So why, if you're looking at the evidence in the light most favorable to the plaintiff, why is that not? Because at the end of the day, as the judge found, the substantial truth is that the state did think, they said, quote, in their complaint, Tug Valley was among the most notorious of the pill mill pharmacies in southern West Virginia. The state characterized Tug Valley as a pill mill pharmacy located within two notorious pill mill positions. So you're pretty much just asking us to read suing out of the broadcast, right? There's no defamatory thrust of suing. You have to look at that and drill down. What is the defamatory thrust of the fact that the state sued Tug Valley? Well, you would say it shows that the state does not think well of this pharmacy. Well, no, it's also that the state is willing to marshal its resources to, I mean, it's a substantial action when a state takes on a private entity. Right. And puts its credibility, expenditure of taxpayer dollars. That's a lot different than just saying we don't think much of this pharmacy in a complaint. Okay. But, Your Honor, it shows that the state thinks the pharmacy did, in fact, engage in practices that were improper, that they were a pill mill pharmacy. Well, we could go around and around, but the essential thing here is that being sued, implying that someone is being sued is not even the same as the state in a complaint against someone else makes some negative statements about them. That's an essential point here. But I think more the question here is whether this was challenged, this challenge or this conclusion that the district court made, did your opponent actually challenge this on appeal, the conclusion of the district court? That's the question. Well, the one that we have argued waiver was this business about the temporal implication, the time changing. That was not argued below. I wasn't asking about what was argued below in terms of if you don't challenge the conclusions of the district court or the findings there, those findings are held by us as being to be so. And so that's a critical question here that needs to be decided. All right. Well, I would say to you that I think the fundamental point that we have is that the plaintiff has, throughout these proceedings, not really understood the whole point of the substantial truth defense. And that's the crux of this, and it also speaks, Judge Keenan, to your point. And that is the law of libel overlooks minor inaccuracies and concentrates on substantial truth. Minor inaccuracies that do not amount to falsity so long as the substance, the gist, the sting of the charge is justified. The whole crux of it, the way this distills down is what the court is told to do is look at this and see whether the statement, it will not be considered false in the eyes of the law unless it would have a different effect on the mind of the reader from that which the pleaded truth would produce. There's a good example in our papers of a case, it's the Walters case. There, a police department posted on Facebook that the plaintiff had been arrested for possession of cocaine. Turns out he was actually arrested for possession of hydrocodone. Plaintiff sues for defamation, says you've said a horrible thing about me that I had cocaine. The court looks at that and says no, that claim will not fly. Why? Because the court said there would be no different effect on the mind of the average reader between what the police posted and what the conceded truth was. And that principle is at the crux of this very case. And that's why, whether it was 150 pills day after day, or whether, when you look at it, you drill down, it was 162 pills, all right, every day on average between the two clinics. There is no reasonable viewer that looks at that and goes, well, you know, 150, the fact that it wasn't 150 every day, but you mean to tell me this guy is moving 162 prescriptions in that little community of slightly over 3,000 folks? We find that deeply troubling. That's at bottom what this is about. And what the plaintiff has done, the second thing, which speaks to these implications, Your Honor, the plaintiff challenged three implications. He looked at this piece and he said there are three defamatory implications. The first, that Ballengee or Tub Valley was sued by the state of West Virginia, which Judge Keenan, we have talked about. The second was that Ballengee was criminally charged or was currently under investigation by the state of West Virginia. And the third was that Ballengee intentionally acted illegally, acted immorally, and or contributed to this opioid crisis for profit. As this court held in the Chapin case, because the Constitution provides a sanctuary for truth, a libel by implication plaintiff, if you come in wanting to sue for a defamatory implication, you must make a rigorous showing where the express facts are literally true. The court said to make out one of these claims, you need two things. The report must be reasonably read to impart that implication and the report itself must affirmatively suggest that its author intends or endorses that implication. Now, we've talked about the first implication. The second of those implications. Well, you're doing something the other side didn't do about to do. They didn't address those three allegedly defamatory implications in their briefs here. They talked about the present tense conditions and the association of McKesson. That's the so-called temporal implication. I understand that, but that wasn't argued below. No, sir. Why don't you mention it? We did. Why don't you argue that now? You're talking about three implications they argued below, but they have not argued here. Well, all right. That provides this court a basis on which to affirm the judgment below. All right. The temporal implication, you're not going to find that in the record. Plaintiff's not going to come back and show you where that is. But none of these implications, at the end of the day, hold water. And the reason is the same for each. And that is because there's no evidence that the defendants intended or endorsed these implications. And for most, they're not reasonably conveyed. They're not imparted by that allegedly challenged report. So it's as simple as that. The other thing I would say, Your Honor, if you want to talk about that so-called temporal implication, that as we explained in our briefs, they can't raise that now. But even if the court were to say, like, okay, well, we'll give that some credence. We'll take a look at that. Fallon G. cannot demonstrate that that's materially false. For one, he claims that it was somehow misleading and CBS was misleading in reporting that he's now being sued. Let me ask you, are the West Virginia cases that say that the speaker or the broadcaster has to intend the implication? That doesn't come out of the West Virginia cases. That comes out of this court's cases. And that's based on the constitutional analysis, not one of state law. That's what this court said in the Chapin case. And that's premised on, based on the First Amendment and the Fourth Circuit's interpretation. It wasn't applying West Virginia law. It was not. It was not. But it's applying the First Amendment. Tell me about West Virginia law. Isn't that the law that applies here? It is not on these issues. Really? No. West Virginia law applies to things like what's defamatory. You get into issues like what's the standard of proof on falsity. That's the United States Supreme Court in Hepps. That's what's the standard on fault. That's New York Times v. Sullivan. That's federal constitutional law. And this court's teachings on that score are what carry the day here. West Virginia doesn't speak to that and can't, frankly. So, last thing I'll just tell you, I don't know if this will give you comfort or not, but on this whole temporal thing, this new creature that has come to visit with us, the other thing is it's premised on the notion that Balanji's pharmacy practices, he basically has got this new look at it. He says, well, okay, all right already. Maybe I was behaving inappropriately or my practices were not up to snuff back in the days when those pain clinics were in operation. But, you know, I cleaned up my act and in 2015, in 2016, I was running things differently. The fact is that that is not supported by the record either. As recently as November of 2015, Mr. Balanji was filling opioid prescriptions written by a doctor, Michael Kostenko, who was over in Raleigh County. This doctor had a pain clinic that was shut down. His license was revoked due to the deaths of several of his patients. This fellow was later sentenced then to 20 years. He gets convicted and sent off. Mr. Balanji, for his part, is filling this guy's prescriptions. When asked in his deposition, like, why are you filling those prescriptions for this guy who's been shut down, he basically says, well, my view is that I have a duty to fill a prescription. We had a pharmacy expert who looked at this and said, well, wait a second. You have a duty to fill if it's for a legitimate medical purpose. And that's what was alleged in the complaint that was brought against Mr. Balanji and went all the way up to the West Virginia Supreme Court. Said, no, you need to fill if it's for legitimate medical purposes. Mr. Balanji's view was no different in 2008, 2009 when he was filling for those pill mills or when he was filling in 2015 for Dr. Kostenko. He feels if it's written by a doctor who has a license, then he's going to fill it. And that's improper. It was improper then. It's improper in 2015. So even on its merits, this temporal business doesn't really fly. Lastly, your honors, I would say one other thing. We have two other bases on which this court can affirm the judgment below. They were not reached by the district court. He didn't find it necessary. But we have an argument in our papers, and I can just give you a real quick summary. But the fair report privilege finds another basis on which this court can affirm. The challenge statements were fair abridgments of judicial records in that West Virginia Supreme Court proceeding. There's the testimony of Mr. Balanji, which then ends up in the Supreme Court brief. And that's faithfully reported. There is this affidavit in the case where Randy Balanji sued McKesson. And that, too, is a fair abridgment of that is provided. The other basis is public figure actual malice. And it is clear, if you look at the material of record in this case, that there is no way on this record that you can find actual malice. And that is to a certainty. My time has expired. If you have any questions. I had one question I need you to at least help me. I'd ask you about the West Virginia law. This is a diversity case. And my understanding is West Virginia substantive law applies. How would you say it does not apply in this case? I mean, we're not talking in terms of a public official time Sullivan situation. So what is it that you say? How do you say West Virginia law does not apply here? Oh, no, sir. Because when I asked you whether West Virginia law had anything on whether the speaker broadcast it has to intend the implication, you blew it off. That doesn't matter because there's a chaplain case. And I said, no, chaplain has nothing to do with West Virginia law. And you gave me a whole spiel about national law. So help me out to understand what is the role of West Virginia law here from a substantive perspective in a diversity action, which seems to be that's the rule. But I need to understand your answer. Okay. And it sounds like I was unclear. What I was saying is West Virginia indeed provides the controlling law on what the elements of defamation are. And that requires certain things. Should it be defamatory? How do you define defamatory? You look at West Virginia cases and how its Supreme Court is wrestling with that. Define that. It is controlling in those areas. There are other areas that are controlled under a federal constitutional standard. And that's where I say this court in its chaplain decision said, okay, there's a question of defamatory implications. When should they be actionable? And they have spoken and said you got to satisfy two prongs. All right. On that issue, you would look to your chaplain decision for the rule of decision. West Virginia doesn't really speak to that. What West Virginia says is, yeah, you can sue for defamatory implications. Sometimes it's characterized as innuendos or inferences. The courts have been a little loose in their language, frankly. All courts have. But at any rate, so this court said we need to grapple with that. Constitutionally, to satisfy federal standards, what do you need to make out? This court grappled with that and said, okay, here's the deal. You need to meet these two prongs of this test. And that's what they set out. And for that purpose, that's what you got to look to. All right. Thank you. Thank you, Your Honors. I'd like to address the issue that you raised, Judge Keenan. I don't know whether I've consciously waived the temporal argument or not, but all I can say in my defense is that the affidavit of Mr. Balengie that I attached in response to the motion for summary judgment sets forth a lot of facts that certainly make the temporal flow of Mr. Balengie's conduct to be relevant, I think. Secondarily, if I've waived it, Mr. Sullivan made a motion to the court to introduce the indictment against my client in Ohio, and I responded to that. I would assume that my response to that is if the indictment is going to be considered, then my response to it and the exhibits I attached could be considered as well. But I think that perhaps he opened the door and allowed me to do that. That would be my counter to whether I've waived it or not. But I think the key here is especially the McKesson, the way Kesson broadcasts. McKesson is the evil drug distributor, the most heinous of all of them, and most people know that. And CBS connected guilt by association, connected Mr. Balengie to McKesson. The whole broadcast was about McKesson, and they brought him back in, his clip back in, and talked about him being associated with him. And we took the deposition of McKesson's compliance officer, and he basically said, we knew about Mr. Balengie's lawsuits. They never sent any notice to the DEA about suspicious orders from Mr. Balengie. In fact, Mr. Balengie during his whole time testified that he never received any notice from any distributor that he was making suspicious orders. So for what it's worth, I think the malicious nature of the insertion of the word pain in the broadcast and the fact that it wasn't, there was no basis for it, it was negligent. The standards person for CBS even said he did ask Ms. Velie about the 150, and she said that's no problem. He didn't go back and check it himself. He said if he had known that there was a question, he had a question just from the number, but he said if he had known what was actually said, he would have gone back and read the transcript. So they're victimizing Mr. Balengie to make a point in that first broadcast, make it look like this is a current problem. We're exposing something to the country here in West Virginia. But actually, Mr. Balengie hadn't really done anything that out of the ordinary since 2009. And here he is, the poster boy for the expose. But then when they go and use it a second time, and I concede that most of the harm to Mr. Balengie occurred before the second broadcast, but nevertheless, they harmed him further in the second broadcast by associating him with McKesson without any understanding at all of his relationship with McKesson. And he, you know, it's basically, it's a jury question whether or not substantial truth occurred here. I'd love to argue that in front of a jury. Five out of 562 is substantial. And taking all the other things into account, Mr. Balengie was just a normal pharmacist in terms of his numbers from 2014, 2010 really, 11 forward. But he, you know, he did not really, you know, there's no reason why they had to do what they did to him in either broadcast. And it's certainly not substantially true. It's a factual question. And the, you know, that's actionable. He deserves to have a day in court on that and to make that argument to a jury. That's all I'm saying. Judge Goodwin did not follow the standards for evaluating a motion for summary judgment clearly. Thank you. All right, sir. Thank you. We will come down and greet counsel and then we'll proceed to hear our next case.
judges: Barbara Milano Keenan, James A. Wynn Jr., Allison J. Rushing